## Curran's Estate

[redacted]

*Thomas Stokes* and *George Wharton Pepper*, for trustee.

*Allen Hunter White* and *Boyd Lee Spahr*, of Ballard, Spahr, Andrews & Ingersoll, for Wilson College, exceptant.

*C. Russell Phillips* and *Robert T. McCracken*, for the Philadelphia School for Christian Workers, exceptant.

*David B. Skillman* and *Ralph B. Evans*, for Beaver College, contra.

*James Frank Shrader*, for Philadelphia Presbytery.

*James L. Rankin*, for Synod of Pennsylvania.

HENDERSON, J., June 17, 1932.—The distribution of the testator's residuary estate, principal and income, is before us upon exceptions to the auditor's report and supplemental report.

In re Curran Foundation Charter, 297 Pa. 272, our Supreme Court said:

"We are not now concerned with an inquiry as to whether or not the testament, the amount of the estate, or any other cause, will require the income to be directly distributed by the trustee, or to be awarded to an existing 'college,' to a 'new organization,' or under the cy pres doctrine to some other institution which can best carry out testator's paramount intent, as nearly as it can be done. This matter will be determined, in the first instance, when the account of the executor and trustee is before the orphans' court. What we are

now concerned with and decide, however, is that petitioners, as appointees of the trustee, are not specified, even though incorporated, to be the almoners of testator's bounty; and hence, since a preparation for so acting was the only object sought to be accomplished by the present charter, it has no legal purpose to support it."

The auditor has found that the will sets up a "foundation" for the testator's educational uses and has awarded the corpus to the testamentary trustee for those purposes, and no exceptions have been filed to this award.

The question now presented for decision is, who is entitled to the income?

There are three sets of exceptions before us—those filed on behalf of: (1) Lafayette College, (2) The Philadelphia School for Christian Workers and (3) Wilson College, the income having been awarded to Beaver College. We will consider these in turn.

### Exceptions of Lafayette College

In the third codicil the testator provided as follows:

"When and as soon as the aforesaid annual income of thirty thousand dollars is completed, I desire my trustee to accumulate a further sum of five thousand (5,000) dollars, the annual interest of which shall be paid to Dr. William C. Cattell, President of Lafayette College, at Easton, Pa., or his successors in office, the income of which sum shall be paid to competent and distinguished lecturers, to deliver not less than six lectures annually before the students of said college, on the principles of the Reformation, &c. &c. I hope these lectures may be esteemed worthy of publication."

The auditor has found that the annual income from the trust had reached the sum of $33,502.24 by October 30, 1924, and by November 3, 1924, the sum of $5000 additional had been accumulated. The college claimed interest on the legacy from the latter date.

The learned auditor has found that because Codicil No. 1 directed the trustees to pay off all encumbrances on his real estate, this college was not entitled to interest until that was accomplished, to wit, on February 2, 1928. We are of opinion that the auditor erred in that the gift is in the third codicil and this sum is to be accumulated as soon as the estate was producing $30,000 a year—which was on October 30, 1924, and the accumulation was complete on November 3, 1924, from which date interest at the rate earned by the fund is awarded.

The provisions of Codicil No. 1 are to be carried out, but not at the expense of this college.

The exceptions of Lafayette College are sustained.

### Exceptions of the Philadelphia School of Christian Workers

The auditor's findings, supported by the evidence, are that this is not a female college but a coeducational school of special, or vocational, training. It does not offer a liberal education "of the highest culture."

Hence the exceptions of this claimant are dismissed.

### Exceptions of Wilson College

The income of the Foundation is about $50,000 per annum. The auditor has awarded it to Beaver College. To this Wilson College has excepted. We will now consider these questions.

This matter has been extensively heard, the auditor held many meetings, filed a report, a supplement thereto, and, after argument before our court in banc, was recommitted to him for further investigation, and thereafter he filed a supplemental report.

The dispute in this matter is not so much over questions of fact as over the

meaning of the will and the inferences to be drawn from the testimony. We shall quote the auditor's analysis of the testimony relating to Beaver College and then his analysis of that relating to Wilson College.

A. *Beaver College.*

"(a) History and religion.

"Beaver College is a combination of Beaver College, at Beaver, in the western end of Pennsylvania, and Beechwood School, a private school for girls at Jenkintown, Pa. The college was incorporated by the Act of February 21, 1872, P. L. 133, under the name of Beaver College and Institute, originally 'for the education of both sexes,' amended in 1907 so as to contemplate only the education of women. At first the president had to be a Methodist, later of some Protestant Evangelical Church, the Methodist Episcopal Church naming eight out of the thirty-three trustees (Amendment of 1910). In 1925, when the merger with Beechwood took place, the trustees were reduced to seven self-perpetuating members; and in 1928 an amendment contained a provision that the college should always maintain a connection with the Presbyterian Church, United States of America; and that in case of a severance gifts received from Presbyterian sources should be returned to the Board of Christian Education (Notes, page 186). The corporation is a stock company, with shares of the par value of ten dollars (Notes, page 194).

"At the time of the merger there was difficulty in obtaining students, and the endowment had shrunk from $40,000 to $21,000. After the expenses of the merger had been paid, the balance was turned back to the Methodist Episcopal Church, and little or nothing was realized from the sale of the real estate after the mortgages had been paid (Notes, pages 130-34).

"(b) Plant, equipment and endowment.

"The property consists of the Beechwood Plant near Jenkintown Station (eleven miles from Philadelphia) and 'Grey Towers,' at Glenside (twelve miles from Philadelphia and one mile from Jenkintown). The main Beechwood building was formerly a summer hotel erected about thirty years ago, in rather shabby condition, and only moderately well adapted to the needs of a college. There is one modern dormitory for sixty-four students, several smaller dormitories, a brick and stucco recitation building, a modern well-equipped gymnasium, and five houses, near the main property, used for the accommodation of students and faculty (Catalogue, Beaver Exhibit 10). The main property, consisting of ten acres and the main school building, was bought from Beechwood School in 1925 for a ground rent of $200,000 and a mortgage of $53,000, a total of $253,000, written up on the books the year to $577,500 (Notes, page 205). The houses are carried at cost.

" 'Grey Towers' at Glensde is twenty-six acres in extent, with a hugh stone dwelling, copied from an English castle, purchased from the Harrison Estate. In 1929 the college bought 136 acres for $712,500; resold all but the present twenty-six acres to the Cardinal Archbishop of Philadelphia for $425,000; gave a purchase money mortgage of $237,500 to the Harrison Estate, and raised the balance of $50,000 necessary for settlement by bonds secured by a second mortgage to Glenside Bank and Trust Company (Notes, pages 206, et seq.). Actually, therefore, no cash was put up by the college. The actual cost to Beaver was, therefore, $287,500. It is carried on the books at $2,300,000, on a theory of reproduction value, an average of three appraisals made for the college (Notes, page 206); and the purchase was referred to by Dr. Greenway, president of the college, in a circular letter of December 15, 1928, as adding 'a $2,000,000 property to an already fine equipment' (Notes, page 328). Frank P. Felton, a very well-known real estate dealer and expert in Philadelphia,

valued land and buildings—sound market value—at $510,000, and the auditor believes that this figure is substantially reliable.

"The main building at Glenside is a massive, ornate pile, copied from Alnwick Castle, with elaborate wood carving, costly silk panels and large rooms housing six to eight girls. It is not fitted for college use from the point of view of convenience or economy. But it undoubtedly has a certain air of sombre elegance, which, with the very beautiful grounds on which it is situated, gives an 'atmosphere' which presumably has value. The old stables—on the same elaborate scale—have been rather cleverly reconstructed to house a chapel, gymnasium, laboratories and lecture rooms. The lodge has been turned into a small dormitory, and there is a thoroughly adequate power plant. The location and grounds are ideally located for the purpose, and will allow for ample development. Eventually, such development will probably consist of gradually abandoning Beechwood and enlarging the Glenside plant. Busses now run regularly between the two properties.

"The library — 10,000 volumes at Beechwood — is admittedly inadequate. Arrangement has been made, however, for the students to have access to the local public libraries.

"Beechwood has no endowment. Of this fact, Wilson makes much in its argument. But Beaver seems to be run successfully from a financial point of view. In the year ending June, 1929, the college made a net profit of $25,000 (Notes, page 200). Although the profit from dormitory operation is not allocated separately on the books, it appears that this profit for the year ending June, 1929, was between $60,000 and $80,000 (Notes, page 335). For the school year ending July 2, 1928, Beaver reported to the Department of Public Instruction of Pennsylvania, under 'productive endowment'—'Dormitories produce equivalent of an endowment of more than $500,000;' and for the next year— 'Amount of productive endowment $2,113,439 (dormitories).'

"There is no doubt that Beaver's chief weakness is its lack of endowment. The auditor is of the opinion that this would prevent it from being accepted by any of the accrediting agencies already referred to, which require a minimum endowment producing $25,000 outside of tuition fees. And, conscious of this weakness, Beaver has tried to show that its income takes the place of such endowment. But these statements do not seem to the auditor accurate in substance or convincing.

"(c) Faculty.

"In the 1929-30 catalogue (Exhibit 18), 23 professors are listed in the faculty, 18 assistant professors, 25 instructors, 3 lecturers, a total of 69. Of these, 64 were teaching during the last current year, 48 full time and 16 part time, the latter chiefly in music and fine arts (Notes, page 233). Several full-time professors are also ministers in active charge of parishes, carrying fifteen or more hours a week teaching. Several of the faculty give only one hour a week (Notes, page 236), and some lecture only a few times a year (Notes, page 237). Of the full-time teachers, 7 hold doctor of philosophy degrees, 7 master's degrees, and 23 bachelor of arts degrees (Notes, page 268). Salaries paid the members of the faculty do not appear to be adequate. One professor gets $1800; twenty-five per cent. of the remainder are paid $1200 to $1500, averaging $1100, one full-time professor receiving only $700 (Notes, page 238). These figures include a 'home,' that is, board, heat, light, laundry and room. The teachers' quarters seemed to the auditor somewhat cramped.

"(d) Courses of instruction.

"Beaver divides its instruction into liberal arts and science and education (Exhibit 18, page 30). The degrees granted are bachelor of arts, bachelor of

sciences and, in education division, bachelor of science in education, bachelor of music and bachelor of fine arts. For a bachelor's degree, 120 semester hours are required, without counting required Bible work. In the liberal arts division each student is required to 'major' in one subject; in the science course she must major in biology, chemistry, physics or mathematics. In the education division the student must also select her major subject, and may obtain a bachelor of science degree in education, Christian education, home economics, commercial education, health education and kindergarten—primary education. The subjects of instruction listed in the catalogue include biology, chemistry, Christian education, commercial education, education, English, English Bible, fine arts, French, German, Greek, health education, history, home economics, Italian, kindergarten, Latin, mathematics, music, philosophy, physics, political science, psychology, social science, Spanish and speech arts. This is a wide variety. The auditor believes, from his personal inspection of the classes and of some of the work done, that a good deal of this instruction in elementary, some of it superficial. The type of instruction is not comparable to that given at Wilson.

"As to the classics, the entrance requirements call for two units of Latin; two professors are competent to teach Latin, although only one is now teaching, who also teaches Greek (Notes, page 271). There are forty students in the Latin department, thirty-nine taking Greek. There is no call for teaching Hebrew, although two teachers are qualified to teach it (Notes, page 272). Twelve courses are listed in Latin in the catalogue, and ten in Greek. A few of these, however, are merely lectures in English and not studies in the languages themselves.

"Every student is required to take a minimum of one hour a week in Bible, and there are eighty-one hours a week additional enrolled in Bible work (Notes, page 273). There are four instructors in Bible classes, including the president. Daily chapel service is compulsory, and is held both at Jenkintown and Glenside. There are weekly Sunday evening services.

"Beaver College is not a member of any accrediting agency (Notes, page 278).

"(e) Students.

"Of the 621 students for 1929-30, forty-four, or seven per cent., take the liberal arts course; two, or three-tenths of one per cent., the general science course, and the remaining ninety-two per cent. are taking courses, really vocational, leading to a bachelor of science in education degree (Notes, page 270). This does not mean, for instance, that the 130 girls listed as taking the kindergarten-primary courses are taking only subjects in that field. This course requires conferences and practice teaching in kindergartens; but there are also some requirements in English, history and philosophy, as well as electives in those and other 'liberal subjects.' The next largest classification is education, with 108, then home economics, 87; secretarial, 80; fine arts, 38; public school music, 31; physical education, 27; speech arts, 24; commercial education, 23. Music has 7, and Christian education only 2. A like condition is found in the Beechwood School before the merger; and the first year after the merger only 23 out of 325 were taking the 'liberal arts' course (March, 1926, Catalogue, Exhibit W, page 17); 14 out of 421 in 1927 (Catalogue for March, 1927); 15 out of 413 in 1928 (March, 1928, Catalogue), and 7 out of 314 for 1929 (March, 1929, Catalogue). The catalogues show that from 1926 to 1928, inclusive, 65 bachelor of arts degrees were granted, of which only one was in liberal arts.

"Of the 40 girls graduating in 1928, 27 received teachers' certificates from the Department of Education of Pennsylvania; and in 1929, 36 out of 60.

Such certificates are granted to Beaver by practically all the states (Notes, page 284).

"Thus it will be seen that actually Beaver is giving chiefly vocational training for teaching in the public schools, in courses of a practical nature, without the broad cultural education of a college of the standing of Wilson."

B. *Wilson College.*

"(a)  Plant and equipment.

"Wilson College is situated at Chambersburg, Pa., 156 miles by rail from Philadelphia (Notes, page 46). In 1880 it took five hours and twenty-five minutes to cover this distance by rail; and today it takes four hours and eight minutes (Notes, page 337). The college stands on fifty acres of well-kept ground in the borough, charmingly situated, on which are erected the dormitories and other college buildings, including an excellent library, containing approximately 23,000 volumes, power-plant, music hall with an auditorium also used as a chapel, gymnasium and two buildings used for biology, physics and chemistry, with recitation rooms and well-equipped laboratories. The main building contains an auditorium with an organ, the executive offices, classrooms and a commodious dining hall (Wilson, Ex. 2, Annual Calendar). A new recitation hall is being built at the cost of $150,000. The auditor was impressed, in his visit to the college, with the excellent arrangement of the buildings, the modern conveniences of those that have recently or are being added and the cultural atmosphere of the college grounds and buildings.

"The valuation of buildings is based on an appraisal made in 1907 of those then erected and at cost on those subsequently built (Notes, page 78). A fair valuation of grounds and improvements, not including the new recitation hall, is $796,000 (Wilson, Exhibit 13). The total endowment, as of January 1, 1930, was $708,077.24, invested in securities and cash (Notes, page 88). The Board of Christian Education of the Presbyterian Church in the United States makes to the college an annual contribution of $5000. The college has no debts (Notes, page 77).

"(b)  Faculty and courses of instruction.

"There are 47 full-time professors (Notes, page 39), of whom 14 hold doctor of philosophy degrees and 22 master's degrees (Notes, page 39). All but five are women. Senior professors get $3000, other full-time professors from $2000 to $3000, assistants $1500 to $1800; instructors $1300. Housing is furnished in addition to these salaries, which are increased at the rate of $100 a year up to $3000 (Notes, page 41).

"Wilson offers two courses, one leading to the degree of bachelor of arts and the other to the degree of bachelor of science. The requirements for admission are those in common use among the leading women colleges of the country, as appears from Wilson's Exhibit 14 (Notes, pages 92, 93), where a comparison is made of the standards of admission of Wilson, Radcliffe, Wells, Vassar, Smith, Mount Holyoke, Wellesley and Goucher. The standard requirements in Latin, English and science, recommended by the so-called 'accrediting agencies,' are in effect.

"Wilson offers a wide range of classical courses. Twelve courses in Greek, under Dr. Alberta Mildred Franklin, Ph. D., Columbia University, are found in the catalogue; fifteen courses in Latin, taught by four teachers; and, according to Dr. Warfield, the college is prepared now to give a course in Hebrew if there is any demand for it (Notes, page 40).

"Four courses are required in the Bible, covering the Old Testament for freshmen, Prophets for sophomores, life of Christ for juniors and a history of apostolic Christianity for the senior year. In the catalogue twenty-two courses

are offered, of which five were not offered during the year 1929-30. The president, Dr. Ethelbert D. Warfield, who holds degrees from Oxford, Princeton and Columbia; the Rev. Warren N. Nevius, Princeton A. B. and A. M., a graduate of Princeton Theological Seminary, and Jennie M. Strevig, A. M., a graduate of Biblical Seminary in New York, give the Bible courses, which deal with Biblical literature, religious history and philosophy, practice religions, service, exegesia, Bible teaching and religious ethics.

"The auditor's close study of the Wilson catalogue, his talks with the president of the college and his visits to the classrooms convinced him that Wilson offers a liberal culture, that it does not give vocational courses except such as are required by the Department of Education of Pennsylvania for teachers' certificates (Notes, page 29), and that its aim is to furnish a well-rounded education. Students, in accordance with common practice, are required to pick major and minor subjects. For the first three years specified exercise is prescribed. The girls seemed to the auditor to present an unusually healthy, vigorous and contented appearance. In addition to those already described, courses are given in economics, sociology, education, English, history, the Romance languages and German, history of art, mathematics, music, philosophy, psychology, physical education; and, under the head of general science, biology, botany, zoölogy, chemistry, geology and physics.

"(c) Scholastic standing.

"Wilson College is a member of the Association of Colleges and Secondary Schools of the Middle States and Maryland which, together with other educational associations, have formulated certain college 'standards' through the American Council on Education (Notes, pages 3-5). These are found on pages 6 to 9 of the notes; and, among other things, call for an annual operating income of $50,000, of which at least $25,000 should be derived from sources other than students; a library of at least 8000 volumes; doctors' degrees, or the equivalent, for the heads of departments, and teaching schedules not exceeding sixteen hours a week.

"Wilson is approved by the American Association of University Women; is approved as a standard college by American Medical Association, and its president is a member of the Association of College Presidents of Pennsylvania. Much testimony was taken to show what membership in the so-called 'accrediting agencies' meant, and the nature of their activities. The auditor is of the opinion that such membership is evidence of the institution's recognized academic standing. On the other hand, failure to belong to such associations has no conclusive significance. However, the standards formulated by them, and particularly those referred to in the preceding paragraph, are useful guides in trying to gauge the particular institution's standing and educational fitness.

"In 1928 the Carnegie Foundation, at the request of the Pennsylvania College Presidents' Association and the State Department of Public Instruction, conducted a test among forty-nine Pennsylvania colleges, to obtain, as Dr. Learned of the Foundation testified (Notes, page 79), 'a sort of inventory of the minds of women in colleges about to take their diploma.' Wilson ranked sixth, the other two claimants not participating (Notes, page 81).

"(d) Students.

"Of the 420 students enrolled for the current year, 340 are taking the bachelor of arts course and 80 the bachelor of science course (Notes, page 28). Ninety-seven students are from Philadelphia and vicinity (Notes, page 29). Two hundred and sixty-three students are Presbyterians (Notes, page 51);

50 are daughters of Presbyterian ministers (Notes, page 29), and 10 of Presbyterian missionaries.

"Forty-four students (by courses 49) take Greek, and 110, Latin (required the first year), of whom 46 were taking advanced courses in the last three years (Notes, page 29). All students are required to take Bible, and in addition, 85 or 86 are taking Bible electives (Notes, page 30).

"Of the 1640 graduates (Notes, page 11), many have become teachers, 360 since 1921 having received provisional college certificates from the Pennsylvania Department of Public Instruction, of which 69 were received by girls graduating in 1929 (Notes, page 40). A few graduates every year become missionaries, particularly in the medical field (Notes, page 61). Graduates of Wilson are accepted by the leading universities (Harvard, Pennsylvania, California) for postgraduate work on the usual terms (Notes, page 41).

"(e) Religion.

"Wilson is a Presbyterian College. It was incorporated by the Act of March 4, 1869, P. L. 504, amended March 23, 1920, by the Common Pleas Court of Franklin County (Exhibit No. 1). The requirement in the original charter that a majority of the trustees should be Presbyterian ministers was changed by the amendment so as to provide that a majority should be members of the Presbyterian Church, and the by-laws made this requirement two-thirds. Now twenty-six of the twenty-nine trustees are Presbyterians (Notes, page 23). The college is under church oversight, receiving an annual appropriation from the Board of Christian Education of the Presbyterian Church in the United States of America (Notes, page 227—$6202.88 in 1929); visited by a committee annually from the Presbytery of Carlisle, which chiefly inquires into its financial needs (Notes, page 24); under the supervision of the Synod of Pennsylvania and the Synod of Baltimore, the former making an annual inquiry into teaching, standards of living, etc., as a basis for the appropriation (Notes, page 25). The churches raised $155,000 toward the endowment."

Thus we have a fairly rough, but accurate, picture of two of the institutions, claimants for the income of this large foundation.

We must next inquire what did the testator direct by his will. It should be stated at the outset that while this is a holographic will, with four codicils, containing obscure sentences, repetitions and like difficulties, these two claimants in many respects agree as to the intent, and it is as to their differences that we shall presently address ourselves.

We will quote the auditor's analysis of this will and codicils:

"By paragraphs five to nine, inclusive, of the will, decedent bequeaths the income of the trust estate for the maintenance of a normal school for female teachers. These provisions are revoked by codicil No. 1, in which decedent declares that it is his will to create a 'foundation,' the annual income of which shall be used to promote the higher education of females in an institution adapted to that purpose, which shall be located in the City of Philadelphia or adjacent to it. He then provides that should this projected 'Female College' not go into operation until after his decease, five named persons are to execute his will so far as relates to the expenditure of the income. (This provision, however, is revoked in Codicil No. 3.)

"In Codicil No. 1 the testator further provided that should the capital of the foundation be impaired it shall be the duty of the trustee to diminish 'the annual appropriation for female education' so as to restore the capital to $500,-000. He directs that beneficiaries of the foundation should be selected on their ascertained merits, first from daughters of foreign missionaries; secondly, from daughters of ministers of the Gospel at home; thirdly, 'from daughters

of the learned professions;' and, fourthly, 'from those who may give evidence of talents which may adorn society and bless the world.' If no college for the education of females in the manner indicated be available in or adjacent to Philadelphia when the trustee is prepared to appropriate the income, the trustee is authorized to select from the Sessions of the Presbyterian Churches in Philadelphia five directors to exercise the powers and be subject to the restrictions imposed in the will. These directors are to 'elect' a competent female who shall be professor of the Latin, Greek and Hebrew languages and literature. Codicil No. 2 directs that this professorship shall be named 'The Wiltberger Professorship.'

"Codicil No. 1 further provided: 'I would use the Bible as a Sun, around which, the education of the beneficiaries of this Foundation shall revolve. I esteem female piety as necessity to the highest progress of society. It is my desire that these graduates should be qualified as Teachers, and that every one of them should be able to read the Sacred Scriptures in the original languages. In Matters not essential to my great purpose, I permit a wide and sound discretion: I would combine the highest culture which our beautiful City can afford, with consecration to the cause of Christ; so that the beneficiaries of this Foundation may be "as corner-stones, polished after the similitude of a palace;" "sanctified and meet for the Master's use." It is my Will, that the entire income of the Foundation as appropriated by my Trustee shall be expended exclusively upon Females, either as professors in the Institution, or beneficiaries on the Foundation. Said Five Directors shall have power to expend, of the funds placed at their disposal annually by the Trustee, for premiums to stimulate and develop talent. I authorize the Five Directors aforesaid to provide such Books and literature as will foster a missionary spirit, and such as will illustrate the Bible; its antiquities; its connection with the progress of society, etc.'

"Should the trustee find insuperable obstacles in executing the will in respect to female education, 'either from the want of such a College as my Will contemplates, or from the decease of the Directors named therein, or from any cause,' testator 'recommends' his trustee to resort to the proper authority to cure defects; 'if need be, to the legislature of the State.' He repeats that he wishes all his means, after the death of his wife, devoted 'to the gratuitous education of young women, in my beloved Philadelphia;' mentions that he has made no provisions for grounds and buildings; and expresses his confidence that when his trustee is prepared to appropriate the $30,000, in accordance with his will, to female education, if no female college exists, 'one will soon arise, to meet the necessity.'

"By Codicil No. 2 it is directed that if the projected female college does not go into successful operation within five years of decedent's decease, the trustee shall accumulate a capital yielding an annual income of $30,000 before any appropriation be made for the college. The amount of this capital is referred to as $500,000, from the income of which the trustee is to pay the salary of the Wiltberger Professorship, using the remainder in paying college term bills of students who shall have established their right to the benefits of the will by competitive examination.

"In Codicil No. 3 the testator states that he is satisfied that the efforts made by Dr. Tryon Edwards to secure an endowment for Philadelphia Female College have failed, and that he, therefore, annuls the provision concerning the selection of five directors to supervise the expenditure of the income of the foundation, devolving the duty on the 'board of Directors of the New Organ-

612

ization.' 'I desire that the influence of this College should be to train up Females, who shall provide for themselves and bless the Church of Christ.'

"This codicil further provides that as soon as the annual income of $30,000 is completed, the trustee shall accumulate a further sum of $5000, the annual interest of which shall be paid to the President of Lafayette College, or his successors in office, to be paid to competent and distinguished lecturers, to deliver not less than six lectures annually before the students of the college on the principles of the Reformation, etc.

"The codicil further provides that when the annual income of the estate reaches $30,000 the trustee shall select twelve persons from the Eldership of the Presbyterian Churches in the Synod of Philadelphia, in connection with the General Assembly, who shall apply for such legislation as will give the college legal existence. The Synod of Philadelphia is requested to have an oversight of the progress of the endowment, and the board of directors of the college are enjoined to require every pupil supported by the foundation to pass an examination in the Hebrew, Greek and Latin version of the Sacred Scriptures, and also to be able to repeat the shorter catechism."

The committee of twelve was duly constituted and applied for a charter, which was granted but which the Supreme Court in re Curran Foundation Charter, 297 Pa. 272, reversed, stating it was premature, and that this court must first pass upon the question. It has now been determined that the will sets up a "foundation" or trust estate, the fund has been awarded to the testamentary trustee and no exceptions have been filed thereto.

In his further discussion and analysis of the will, the auditor states:

"The questions presented to the auditor on this record present very real difficulties. It is difficult, for instance, to say what was the 'paramount intent' of the testator by an examination of his will. The will and codicils are written over a period of years, obviously without legal advice, contain confused and conflicting provisions and no definitely guiding principles. What should be done with the income from the trust estate?

"Following the order suggested in this report under the heading of 'Considerations Involved:'

"1. Should the income from the fund be awarded to a single college or institution, if one is available, or should it be distributed here and there to found scholarships, train missionaries and teach the classics in the manner suggested in the petition for distribution?

"The will proper, it will be remembered, first provides for the support of a normal or training school. When this gift is revoked in the first codicil, the testator creates a foundation (that is, the principal of the trust estate), 'the annual Income of which shall be used to promote the higher education of Females, *in an Institution adapted for that purpose.*' If we go no further, therefore, it seems clear that if such an institution can be found the fund should be awarded to it. He speaks in the next sentence of 'this projected Female College;' of 'the annual appropriation for Female education;' and, again, still in the first codicil, provides: 'But should no College for the education of Females, in such manner as will satisfy the requirements of my Will, be available . . .' five directors are to 'proceed . . . to confer the benefits which my Will contemplates on the appropriate objects.' That is, if there is no appropriate college to receive the income to be used in *that* college for higher education (with preference to certain types of young women), the directors must then expend the income for the same purpose, viz., to educate young women. His provision for a competent female to teach the classics, later designated as the Wiltberger Professorship, shows that he had in mind the use of

the income in connection with a single institution. The money is to be used exclusively for females, 'either as professors *in the Institution,* or beneficiaries on the Foundation.'

"Again, he foresees the possibility of obstacles presenting themselves— 'either from the want of such a College as my Will contemplates . . . . or from any cause. . . .' In Codicil No. 2 he refers to the scholarship 'in the College for the education of Females;' speaks of 'this projected Female College;' of 'College Term Bills;' of the 'Directors of said College;' 'the benefits of *said College* for Females,' and of 'this college for female education.'

"In Codicil No. 3 he expresses a 'desire that, what I do this *this College,* shall remain a monument, of my ardent love for the cause of missions;' speaks of 'the influence of *this College,*' and of 'the Board of Directors of said College.'

"In Codicil No. 4 he expresses a desire 'to increase the foundation in the College for the Education of Necessitous Youth.'

"The auditor has gone into the testator's expressions at some length to show that he had a single institution in mind to receive the income, and that not merely that this was his purpose, but that it was his paramount intent.

"One of the claimants may be best qualified to teach classics; another to train missionaries, but unless such claimant is the type of college or institution contemplated by Dr. Curran, it cannot fulfill his dominant purpose.

"In this conclusion of the auditor the three claimants of the fund agree. At the auditor's request they filed supplemental briefs discussing the question.

"2. Is any one of the three applicants the type of college contemplated by the testator?

"The choice can be most easily reached by elimination.

"Must the institution selected be *located in or adjacent to Philadelphia?*

"In Codicil No. 1, after reciting that Philadelphia Female College had been chartered, thus enabling him 'to execute a long cherished purpose, viz: to assist young women to secure a liberal education,' the testator revokes the gift to the normal school, and provides that the annual income of his foundation 'shall be used to promote the higher education of Females, in an Institution adapted to that purpose; *which shall be located in the* City of Philadelphia, or adjacent to it.' At the time the Philadelphia Female College was chartered there must have been female institutions outside of Philadelphia which would have answered the testator's purpose; so that his reference to this institution shows that his long-cherished purpose had been to help a Philadelphia college, and that here was one ready at hand. It seems curious that, having indicated this, he should then appropriate his income 'in an institution' instead of in this very institution to which he had just referred. But his testamentary instruments bear evidence of unrelated thinking. He may have felt that it would be safer not to nominate the college *eo nomine* until he was convinced that it was to be a going concern. His doubt is expressed immediately after the gift: 'Should this projected Female College (note the capitals—probably intended to refer specifically to 'Philadelphia Female College') not go into operation . . .' he appoints five directors of 'Philadelphia Female College' to execute his will in expending this income. If this particular college in Philadelphia was not to get it, some college as like it as possible should. In Codicil No. 3 he states that he is satisfied that the effort to secure an endowment for the Philadelphia Female College is a failure, and revokes the appointment of the five directors, devolving the duty upon the board 'of the New Organization,' which must be created.' But that does not mean that his trustees are to create the new organization. He refers apparently to the new college which is to take the place of the Philadelphia Female College, for

which he had created and accumulated an endowment. Doubt is cast on this, however, by the clause, almost immediately following, directing the appointment of the twelve elders 'who shall apply for such Legislation, as will give the College Legal Existence.' What college? Not, from a study of the whole structure and theory of the will and codicils, a college to be founded by his money. That was to remain in trust. The college was to receive the income. The elders were to apply for legislation if legislation were necessary.

"Going back to Codicil No. 1, we find that the college *'shall be located in the City of Philadelphia or adjacent to it.'* It should 'combine the highest culture which *our beautiful City* can afford, with consecration to the cause of Christ.' In the provision of the codicil dealing with the appointment of the five directors to confer the benefits of his will when the trustee shall be prepared to appropriate the income, the testator, having in mind the possibility that there may be no such college as he contemplates, uses the expression: 'But should no College for the education of females, in such manner as will satisfy the requirements of my will, be available,—*in, or adjacent to Philadelphia.'* The identical words of the original gift are repeated. And a little later, in the same codicil, he declares that it is his will 'to devote all my means . . . to the gratuitous education of young women, *in my beloved Philadelphia.'*

"In Codicil No. 3, the Synod *of Philadelphia* is to have oversight of the progress of the endowment.

"Wilson College argues rather ingeniously that the references to Philadelphia are only to Philadelphia Female College, the testator having in mind this institution when he executed the first codicil. Undoubtedly he had it in mind; but the gift was not to that particular institution. Probably, if it got started, he had in mind naming it by a later codicil; but, as he feared, the attempt was unsuccessful. He does not, therefore, consider it necessary to revoke the gift to Philadelphia Female College, as he had revoked the gift to the normal school, but merely 'cancels that part' dealing with the five directors chosen from the board of Philadelphia Female College. No specific institution was named, and the gift to a Philadelphia college continues. Testator's reference in Codicil No. 1 to the possibility of there being no college satisfying the requirements of his will 'in or adjacent to Philadelphia' admittedly does not refer to the Philadelphia Female College. It refers, as Wilson says, 'to the failure of that or any other college.' But we are first concerned to discover whether any college 'in or adjacent to Philadelphia' qualifies. If there is none, exercising the cy pres doctrine, we must look elsewhere.

"Wilson is 156 miles from Philadelphia by rail, and it takes four hours and eight minutes to get there.

"The testator intended to benefit a college in or adjacent to Philadelphia. Wilson is not such a college. The Philadelphia School for Christian Workers is in Philadelphia; and Beaver is in Jenkintown, eleven miles from the center of Philadelphia, and clearly adjacent to Philadelphia.

"Moreover, Wilson had been in existence for nine years when the second codicil was executed. Tryon Edwards, a great-grandson of Jonathan Edwards, to whose efforts to found the Philadelphia Female College the testator refers in Codicil No. 3, was the first president of the board of Wilson, and it is hardly conceivable that Mr. Curran did not know this, and that he was not familiar with Wilson's work. But he does not mention that college, presumably because it is not in Philadelphia.

"Is the Philadelphia School for Christian Workers a *college* in the sense used by the testator?

"The testator uses the word in its ordinary meaning, i. e., a higher institution of learning. But it means more than that. A college is an institution of general education and not of special training. It could not refer to a medical school, dental school, law school, theological seminary. It is significant to note the use of the word *school* in connection with these postgraduate institutions when we remember that this claimant is called a *school*. It has no powers to confer the usual college bachelor of arts degree, but gives a degree of bachelor of religious education, just as each special school has its special degree. The school isn't a college any more than Wilson is adjacent to Philadelphia.

"And that Dr. Curran meant a college giving the usual liberal course is apparent. He wants the young women to secure a 'liberal education,' . . . 'solid instruction and polite learning,' . . . 'higher education' and 'highest culture.'

"The Philadelphia school is not a female institution. Its charter contemplates men equally with women. And because of its thirty-two regular students one only is a man, that preponderance does not make it a school for women. A possibly less important consideration is that it is under the joint auspices of the Presbyterian and Reformed Churches. But certainly it is not a college for females.

"Beaver is a college for young women adjacent to Philadelphia. It thus fulfills what the auditor considers the dominant purpose of the testator. Dr. Curran created this foundation for a college for women in or adjacent to Philadelphia; and, it may be assumed, a Presbyterian college, since the will contemplates religious education under Presbyterian auspices. Strictly as such Beaver qualifies. There is no necessity for invoking the cy pres doctrine. But undoubtedly there are indications in the will that the testator wanted his money used for certain specific purposes. Can Beaver fulfill them?

"It is important to bear in mind that the question throughout does not involve a comparison of the merits of these claimants as educational institutions, but only which institution will best carry out the testator's wishes.

"There are several purposes expressed in the will and codicils which run through them and are repeated. The testator wanted the classics taught, and a classical chair founded; the Bible was to be taught as an important and integral part of the course; a *liberal* education is preferred; the graduates 'should be qualified as teachers;' they shall be taught to provide for themselves; certain types of students are to be preferred. Therefore, although the testator had in mind cultural education, he also wanted women to be taught to support themselves, and Beaver's tendency to vocational output does not disqualify it if cultural courses and classics are also taught.

"It seems, therefore, of little importance to the auditor that Beaver College may be poorly financed if it can do what is required. In any case, the principal of the fund does not leave the trustee, and the financial strength of the Curran Foundation will not be affected by any financial weakness of Beaver. That Beaver cannot compare to Wilson in scholastic standing is immaterial; nor is it important in making our choice that the members of the Beaver faculty may be underpaid. Perhaps these evils, if they exist, may to an extent be remedied, in so far as they might affect the best use of this large income, by the restrictions on its grant presently to be considered."

This will provides for the education of women (a) in a women's college; (b) in an institution with a Presbyterian background; (c) to be a higher classical education; (d) giving highly cultural courses; (e) with emphasis on Biblical teaching and a missionary spirit; (f) located in the neighborhood of Philadelphia.

As to (b), Wilson is undoubtedly Presbyterian, and it is argued that Beaver was Methodist until 1928, when it changed to Presbyterian, and this change, with other facts, it is urged, was made in order to qualify it for this bequest. Be that as it may, we regard it as qualified in this particular because it has received the approval of the Synod of Pennsylvania, as have all three claimants.

Both claimants admit that the education directed by the will should be: (c) higher classical, (d) highly cultural, with emphasis on (e) Biblical teaching and a missionary spirit.

We have now arrived at the crux of our problem. Beyond all question Wilson easily qualifies under all of these three heads.

This leads us next to inquire does Beaver qualify as to (c), (d) and (e).

We are of opinion that Beaver utterly fails in these qualifications, and will briefly discuss the relative position of these two claimants.

In a few words, this relative position is presented in the "summary" to the auditor's supplemental report, wherein he said:

"In determining whether Wilson College or Beaver College more nearly meets the purposes the testator had in mind, different considerations have been emphasized in the auditor's report and supplemental report. The choice of either college is not free from doubt and depends on a balancing of these considerations, for neither institution completely fits the scope of the testator's wishes. It may, therefore, be convenient to summarize the pros and cons.

"(a) *Wilson.*

"Wilson College has been Presbyterian since its founding in 1869 under the oversight of the synod. It is a liberal arts college of excellent standing, an accredited member of the Association of Colleges and Secondary Schools of the Middle States and Maryland; approved by the Association of American Universities. Its plant consists of twenty-two buildings on fifty acres of land at Chambersburg, valued (as of June 29, 1929) at $796,000. The endowment on January 1, 1930, was $708,077.24, invested in securities. There are 42 full-time professors, of whom 14 hold degrees of doctors of philosophy and 22 master's degrees. Salaries are substantial, ranging from $4000 to $1900. Both bachelor of arts and bachelor of science degrees are conferred, but a large majority of students take the former. There are no vocational courses. Greek or Latin are compulsory freshman year, and these classics are soundly and adequately taught. Four courses are required in the Bible department, and in addition there is a broad range of electives in this field. The auditor can find nothing to criticise in the administration of the college or in its scholastic standing, which is excellent.

"Wilson College, however, is not located in or adjacent to the City of Philadelphia.

"(b) *Beaver College.*

"Beaver College has been under Presbyterian control only since 1928. At Jenkintown it has ten acres of land, on which are an old-fashioned and rather shabby building, formerly a summer hotel, erected about thirty years ago, one modern dormitory for sixty-four students, and several smaller dormitories, recitation building, gymnasium, etc. In addition are five houses for the accommodation of the students and faculty. There are twenty-six acres at Glenside, with 'Grey Towers,' neither convenient nor economical, but with 'atmosphere' and beautifully situated. The value of both properties is given by the auditor's appraiser at $900,250 (October, 1931), subject to encumbrances of $605,100, which are being steadily reduced. Beaver has an inadequate library and no endowment. Salaries to its faculty members are meager, ranging from $2040

down. It is not an 'accredited' institution, but its graduates are given credit by a number of other colleges. Classics are not compulsory, but are competently taught by one member of the faculty to a handful of students. The work is largely vocational, the instruction somewhat superficial, and standards do not compare to those at Wilson. Bible teaching is inadequate.

"Beaver, however, is a Presbyterian female college adjacent to the City of Philadelphia."

We are of opinion that the auditor fell into error when he recommended that all of the essentials of Dr. Curran's plan were to be sacrificed in order that the institution should be in the Philadelphia neighborhood. Education such as this will specifies is a much more important thing than mere location; and when the auditor says that even Beaver does not completely fit "the scope of testator's wishes," he is accepting location as justifying Beaver's lack of all educational standards as set up in this will.

Wilson College adequately and completely fulfills these standards.

We have above dealt very fully with the high standards of education as set up in the will, and these ideals may not be sacrificed to mere location. Especially is this the case when the testator himself in the first codicil recognizes the possibility that there may be "no college for the education of females, *in such manner as will satisfy the requirements of my will* (be) available, in or adjacent to Philadelphia. . . ." And in a later clause of this codicil he directs: "In Matters not essential to my great purpose, I permit a wise and sound discretion."

With the risk of repeating, we again point out that the paramount intent of this testator was to provide "higher" "liberal" education for women, of the "highest and broadest standard of scholarship;" in which Latin, Greek and Hebrew should be taught and the students be required "to pass an examination in the Hebrew, Greek and Latin versions of the Sacred Scriptures and also be able to repeat the Shorter Catechism." The Bible is to be "a Sun around which the education of the beneficiaries of this Foundation shall revolve."

We should state that we offer no criticism of the kind of work being done at Beaver and of those that desire that kind of an education. But we cannot adequately treat the questions involved without emphasizing a comparison of the courses of study of Beaver College with that required by the will.

With the foregoing standards in mind, we will briefly recount wherein Beaver falls short thereof. It is not an "accredited" college, principally because it does not receive such recognition in the educational world; has no adequate library, and the salaries, except that of the president, are ridiculously small, some of the faculty merely getting board and lodging. Competent teaching, such as this will commands, cannot be procured in this way. Its buildings consist of two independent groups, widely separated; the group at Jenkintown contains a shabby old hotel and other buildings, and was acquired subject to a $200,000 ground rent, since reduced to $193,000, and there is also a mortgage of $53,000 against this property. With interest, repairs and some taxes, here is an annual charge well over $15,000 a year, a veritable millstone—one for which Beaver would be better off could it be eliminated.

The other property at Glenside was formerly a flamboyant country home on a beautiful piece of ground. It is poorly adapted for college purposes. The rooms are large, housing six to eight students. This property is also heavily encumbered, and the auditor says that it has "atmosphere" — we think it showy but hardly academic.

The library is totally inadequate—but Beaver pleads their students can use the nearby village library, and we are not told what the local library contains

of use to a student in the classics. The auditor suggests $5000 should be spent on the college library at once.

Now a word as to salaries. One—a teacher of the Bible, gets no salary—only a home. One gets $700, only one gets as high as $1800, twenty-five per cent. of the full-time instructors get from $1200 to $1500, and the remainder average less than $1200. In most cases they also get a home, board, light and heat. The president, however, receives $10,000, also home, board, light and heat—princely compared with what the other members of the faculty get. It almost seems as if the college exists to pay this presidential salary and the interest on the large ground rent on the Jenkintown property, which it is anticipated will be abandoned some day and the institution concentrated on the other property.

Bible study, upon which this testator laid great stress, may be summed up in the language of the auditor—at Beaver—"Bible teaching is inadequate."

Now a word as to the teaching of Latin and Greek and the "highest and broadest standard of scholarship." Both of these languages in all grades is committed to one teacher, who testified that during the last four years she had an average of 11 in Latin and an average of less than 6 in Greek, an average of less than 17 in both. President Greenway had testified that last year there were 40 in Latin and 39 in Greek. The auditor criticised the witness as lacking "candor;" other testimony of the president the auditor termed "disingenuous," and said "it may discredit Dr. Greenway as a witness." In connection with the appraisals of the property, Dr. Greenway resorted to tactics which the auditor regarded as "an attempt to 'puff' the claim of Beaver, rather than a scrupulous effort to disclose all the pertinent facts."

So much for the facts as to the teaching of Latin and Greek to a mere handful of students, all committed to one teacher for all grades, and the attempt to distort them to the advantage of Beaver, and which "mistake" was not freely confessed in advance, but dragged out by the auditor at the supplemental hearing. We mention these tactics as suggesting that other testimony may be equally misleading. It is, to say the least, a piece of "window dressing."

Wherein do we find any evidence of "higher and liberal" education of the "highest and broadest standard of scholarship?" It is meager indeed. A glance at one of the catalogues offered in evidence shows 130 students in "kindergarten," 108 in "education," 87 in "home economics," 80 in "secretaryship,' 44 in "liberal arts," 38 in "general and fashion illustration, interior decoration and decorative design," and other vocational courses. We adopt the auditor's summary when he said: "The work is largely vocational; the instruction is somewhat superficial, and the standards do not compare to those at Wilson. Bible teaching is inadequate."

This fund has been over fifty years in accumulating, and its benefits should not be further delayed in a vain effort to turn a vocational college into one for high-grade classical education. An impossible effort, because vocational colleges yield a profit while classical education is operated at a loss.

Such exceptions of Wilson College as are dealt with in this opinion are sustained, all others are dismissed, and the net income will be payable to Wilson College for the uses and trusts of the will as declared by this opinion.

One thousand dollars a year shall be used "to provide such books and literature, as will foster a missionary spirit, and such as will illustrate the Bible, its antiquities, its connection with the progress of society."

Next, provision shall be made for the salary of the "Wiltberger Professorship." We leave this sum to be fixed by the trustee after consultation with the officers of the college.

The balance shall be used to pay the tuition and boarding and lodging of women of the following groups—preference being given to those from Philadelphia: (1) Daughters of foreign missionaries; (2) daughters of ministers of the Gospel; (3) daughters of those in the learned professions; (4) young women of talent and ability.

We cannot attempt to set up a complete scheme of administration in this opinion. The trustee, Wilson College, and a duly authorized committee of the synod have leave to petition for such further decrees as may be necessary in carrying out the great and generous benefaction of Dr. Curran.

Upon the original report the auditor's compensation was suggested in the sum of $5000, and in the supplemental report he requested a further allowance of $2500. We are of opinion that a further allowance in the sum of $1000 will be adequate, considering that he is an appointee of the court and not serving under the retainer of a private party, hence his compensation is fixed in the sum of $6000, which is directed to be paid, together with the other incidental expenses awarded in his report.

The trust estate now consists of the following pieces of real estate, stated to be all clear of encumbrances:

| Premises | 1929 assessed value |
|---|---|
| Nos. 1312-14-16 Arch Street | $625,000 |
| Nos. 3835-37-39 Market Street | 26,000 |
| Nos. 3 and 5 North 39th Street | 10,000 |
| Nos. 3952 Market Street and rear | 28,500 |
| No. 3954 Market Street | 28,500 |
| Nos. 3956-58 Market Street and rear No. 3958 | 61,500 |
| Nos. 3951-53 Ludlow Street | 5,000 |
| No. 3955 Ludlow Street | 5,000 |
| | $789,500 |

together with the balance shown by the account, $3159.30 (filed in September, 1929), which will be retained by the trustee for the uses and purposes of the will.

The balance of income is $87,052.62, of which $5000 will be retained by the trustee for Lafayette College, interest on $5000 in accordance with this opinion is awarded to Lafayette College, and the balance, composed as indicated in the account, less auditor's compensation and incidental expenses, will be retained by the trustee for the uses and purposes of the will and in accordance with this opinion.